May it please the Court. My name is Gavin Vuriel. I'm here on behalf of Appellant the Food Marketing Institute. This is a FOIA case. The newspaper Argus Leader has requested that USDA produce information related to the Supplemental Nutrition Assistance Program, or SNAP. SNAP is the current name for what used to be called the Food Stamp Program. Argus Leader wants a decade's worth of SNAP redemption data on an annual basis for about 321,000 retailers nationwide. What percentage of all of the food retailers is that? Is that a substantial percentage of all of them in the country? I'm not sure that's in the record, Your Honor, honestly, but I believe that that is a substantial percentage. I think that most food retailers do accept SNAP benefits. Most? I think that's right, Your Honor. Most grocery chains in all portions of the city and all economic strata do allow them to use the card and so forth? I believe that's correct, Your Honor. It can be used at supermarkets, at retail grocery stores, at convenience stores. The SNAP program sets the standard that allows for eligibility, requires certain types of healthy foods and certain stocking requirements and all that, but I think that most grocery stores and retail stores do accept, do qualify under SNAP and do accept SNAP benefits. So this is the second time that this case has come to this Court. USDA initially opposed the disclosure of this information under SNAP, under FOIA Exemptions 3, 4, and 6 and moved for summary judgment on Exemption 3. The trial court granted that summary judgment and this Court reversed, sending it back to the trial court. The trial court then held a bench trial on Exemption 4 only. The USDA abandoned Exemption 6 before the bench trial. And so at the trial, the USDA presented a number of witnesses, three witnesses from USDA itself to describe how the SNAP benefits work and how USDA maintains the information. They presented four retailer witnesses, one expert witness and one witness from a trade association, the National Grocery Association. All of the retailers testified that the release of this SNAP data would reveal sensitive and well-guarded information about sales and trends at individual stores and that the release would enable competitors to create a picture of each individual store's health. Well now, not, not everybody can get a SNAP card, can they? No, that's right, Your Honor. There are, there are criteria set for eligibility for SNAP. So this would be people of lower economic capabilities generally? That's correct, Your Honor. So if a store doing a lot of SNAP business would be in the areas of a city, for instance, that are the lower economic areas of the city, would that be a fair appraisal perhaps of the overall look at this picture we have here? I think that's generally true, Your Honor. I, I don't think there's any doubt that different stores receive different amounts of SNAP, SNAP benefits to have different levels of SNAP sales. That in some stores and in some convenience stores, it can be a relatively high percentage and in other places it can be a relatively low percentage. Because when you go to buy groceries, you don't get on the streetcar or in the car and go across town. Well, perhaps you do for, for sales, but most of the people purchase their groceries at a local venue, right? That's correct, Your Honor. Yeah, I think the testimony was that in general, there are, it varies from retail location to retail location, obviously. But certainly for convenience stores, convenience stores that have, that accept SNAP benefits, their customers tend to be very much either in the, in the neighborhood or in their location where they pass by the convenience store most frequently. As I understand your briefing, you're saying that if, if these individual store amounts are released, then that would cause stores outside the area to rush to that area and set up competition with them so it would, would affect their business. But if, is that really true? Are they going to move into the low economic areas with their stores to compete? That seems counterintuitive to me. You better explain why do you think that's true? Or have I missed the thrust of your argument?  Your Honor, the testimony below was that if this SNAP data is released, there are a number of different ways that competitors would use it. One is, as you describe, in determining whether or not to open a store in an area. There are certainly retail stores, as the testimony indicated, there are retailers who go after these SNAP dollars. That, and I think if you look at Gwen Forman's testimony, she was from Cumberland Farms. She talked about how the margins for SNAP were actually better than the margins for typical products. And so there are folks who will, there are retailers who will go after SNAP customers in particular. And so if this information was released and a competitor was, for instance, looking at, well, do I put a store in this location or a different location? They could look at the stores in the area and say, well, this store has a very high volume of SNAP. It's doing really well in SNAP. It's making a lot of money on SNAP. And they might choose to go there. That was certainly one of the ways that we think that this release would cause competitive harm. But in actuality, most of the SNAP business, because of the nature of the customers, are in the lower economic areas. And you generally, at least in the part of the country that I live, don't see your large chains and so forth that sell everything from overshoes to hamburger and in a big thing. Moving into those areas of the city, even if they know that there's a bigger margin for this business, is that? Yes, your honor. Remember, this is a nationwide release of data that the Argus leader is requesting. There's no doubt that there are going to be some places where retailers aren't going to go. But there are other places where, according to the testimony, where retailers will seek out this information and will seek out these SNAP customers. It is a fiercely competitive business. The money that is used to provide for these better margins, that's United States tax money, isn't it, in this program? And so taxpayers of all venues have an interest in the support of that, or might find that that is information that they'd like to have. And so what you're saying is you're shutting them out of information dealing with their tax money because the newspapers who may want to publish it can't get it under these regulations. Is that the gravamen of the situation? I would say, your honor, that Exemption 4 to FOIA tries to balance the public's need to know versus the competitive harm that could be caused by the submitters of the information. That's what Exemption 4 is all about. Certainly, you're correct that the money that is funding the SNAP program is federal dollars. There's no dispute about that. However, USDA already does publish a fair amount of information about how it spends SNAP money, that the total amount of SNAP expenditures altogether, the amount by state, the amount by congressional district, the amount by zip code, all of that. The amount also, it's broken out by categories of retailers, whether it's a grocery store or a convenience store. All of that is out publicly. What USDA has never released, and until this court's opinion in the prior opinion in this case, had always assumed was improper to be released, was store-level redemption data on each particular store of the 321,000 stores that have participated in SNAP over this 10-year period. And so, it is not as if it is the USDA's position that the public doesn't have some right to know how these dollars are being spent. Just when it comes to the Exemption 4 analysis, the question is, well, is this release going to cause, likely to cause substantial competitive harm? Isn't it, I don't know, is it in the record, and perhaps it isn't so, but hasn't the cost of this program grown greatly over the last 10 or 15 years, for instance, and doubled, tripled, or quadrupled, and doesn't that give pause to the average taxpayer everywhere wondering whether it's being administered as well as it could be, and thus, they kind of like to have some of this information so they could, you know, individual stores and the whole nine yards, so to speak, or am I off base there? No, you're correct, Your Honor. I don't know if it's in the record. I do know that the SNAP program has grown substantially. I think it was in particular around 2008 or 9, it dramatically increased. I think it has tapered off slightly since then, but I think it's still a $68 billion program, without a doubt, a lot of money. And as I said, I don't think that, I understand the public's interest and the need to know. At the end of the day, however, I think that USDA has published a fair amount of information about how the SNAP program operates. USDA obviously is, the whole reason USDA keeps this information is in order to pursue potential fraud. Or issues with individual retailers, they have a system that's set up to do that. And so, what you're really left with is, does it make sense for the public to need to know exactly how SNAP customers are spending the SNAP funds at a particular store? When the disclosure of that can very easily be used to model and calculate the total sales of the actual store, can very easily be used to determine whether or not a store is profitable or healthy, or subject to a takeover, or subject to going out of business. What's wrong with people knowing the financial status of the government supported store in their neighborhood? I'm missing that as to what the precise, the generalized ideas, but I'm troubled by that. But the idea is that that goes directly to whether or not it's a competitive harm to that store. If a store, for instance, is not doing well, and a competitor can determine from the release of this information that that store is not doing well, it is much more likely that that competitor is going to move in and try and force that store out. Or- Isn't that kind of speculative? I mean, if the store's not doing well, who wants to go there to compete? Well, you're correct in that there are a whole lot of factors that go into the determination of whether or not to move into an area. I don't think that was disputed. What I think the district court got wrong, however, was in assuming that, was in concluding that all of the information taken together, there's so many different factors that go into determining whether or not to move into a specific location. That the release of the SNAP data isn't going to add anything substantial to that determination. Let me ask you, do you agree that the finding in this case by the district court of a lack of competitive harm, that we review that for clear error? That's a difficult question, because I think you do, Your Honor. I think it's a factual determination that's determined for plain error. The application of a FOIA exemption is reviewed de novo, but I think that the determination of whether or not there was actual competitive harm is a factual question. Let me run an alternative, perhaps, way that we could affirm. National parks test requires substantial harm to the competitive position of the person from whom the information was obtained. And in this case, the information was obtained from third party processors, not the stores themselves, right? I think that's right, Your Honor. That's what this court has concluded in its prior decision. I will say, however, that- Wouldn't that, in and of itself, be a pretty easy way to affirm the case on a different basis? I'll answer that this way. The DC Circuit has also held, has more recently held, that exemption four is broad enough to encompass potential harm to a third party, even if that third party is not the submitter of the information. So, and that's the Board of Trade of the City of Chicago case, which is cited in our briefing. And so, that's the answer to that question, Your Honor. Obviously, also, this information starts at the retailers. It flows through a third party processor into the USDA. I think the reality is that, in a lot of ways, this is information that comes from a retailer who is going to be suffering the competitive harm. I'll reserve the remainder of my time for rebuttal, if that is- One quick question. Yes. Stigma, you argue the stigma, that's not really caused by a competitor, is it? No, that's correct, Your Honor. We do argue that the court did not properly consider stigma. I would also say that the DC Circuit has also acknowledged that external indicia of competitive harm don't have to be limited just to the harm caused by a competitor. I know that's what I think the DC Circuit said in either Public Citizen or in one of the supplemental cases to National Parks. But the DC Circuit, I think the First Circuit has said that at nine to five as well, that issues with program efficiency can be considered, and that issues like stigma can also be considered. I have one quick question before you sit down. What percentage normally is the SNAP income of a particular grocer's overall income? Is that in the record, or does that vary dramatically? It does vary dramatically. I believe it's in the record. I think that the record testimony was that it could be anywhere from five to 50%. And what would be the determining factors that cause that variance? I think a lot of it has to do with demographics. The demographics of the customers at the store, the demographics of the area in which the store is located. So if it's a low economic area, why, it's going to be 50% of their business. If it's a non-economic depressed area, people with fewer SNAP cards, it's going to be less, is that? I think that's generally the case. I think also, as I mentioned earlier, there are retailers who market specifically to SNAP customers. And so you would expect them to be a higher percentage of total sales. And if it's the higher percentage, was the record below, did that show that if there was a higher percentage of SNAP income to a particular grocer that it was easier to predict other aspects of that business model, whether it be overall income, profit margins, what have you? Yes, I think there's some sealed testimony that I want to be careful not to get into. But if you look at Gwen Forman's sealed testimony, she talks directly about the correlation between SNAP sales and actual sales and how those can be correlated. And in general, Mr. Kondracky, the USDA's expert, said that the release of this data would be a windfall to modelers everywhere in order to figure out total sales at a store based on the SNAP sales. Thank you. Well, thank you. May it please the court, my name is John Arneson. I've been representing Argus Leader Media in this case alone since January of 2011. Judge Kelly, you may remember I was here about four years ago on exemption three. Let me clarify a couple of things. This is a FOIA case. This was a case that after the first exemption three came and passed through this court and went back, exemption four had been deferred. We went through, and Gavin skipped this step, but we went through a summary judgment on exemption four in front of Judge Schreier. And she ruled in our favor, denying the government's motion. But it was thoroughly briefed, it was thoroughly supported by the government's declarations, such as they were, and by the National Grocers Association in particular. After losing that, we then went to this bench trial where the issue was solely one thing. Exemption four, the third prong of the test is the confidentiality aspect. And USDA very specifically narrowed the focus of the trial to the aspect of the case is whether disclosure of the information requested, which was simply the gross annual sales of each snap retailer, whether that disclosure would likely cause substantial competitive harm. That is in our consensus here, is that that's a factual determination. It's a predictive fact, and the bench trial led to the court determining and finding that the predictive fact had not been shown, she was not persuaded. In other words, the negative was that it had not been established that it was likely to cause substantial harm. So we're here today essentially to determine whether that was a clearly erroneous finding. And I think the record is replete with evidentiary basis that would suggest that that is not a clearly erroneous finding. Which of course then fits in to the exemption four, that it does not fit into the mold of exemption four. The other aspect of the case that was actually tried, and I bring this up because I think Judge Gruner's question might have touched upon it. In trying to find maybe different reasons or a simpler way to affirm this case, is was this information actually obtained from a person? And of course, we do have this third party connection between the retailer and the credit card processors and the government. The key thing that we're missing here though, and I did argue this, I was not successful in front of the lower court, is my client asked the government for its records. Now, for example, the reason they're paying these people, of course, is because the retailers have allowed the eligible households. And Judge Beam, let me just mention that the only people who are using these cards are people who qualify because of being low income. So you have to be eligible, you have to qualify. So it's not kind of an across the board standard. And that amounts to anywhere between the United States Census Bureau, 2015 claims about 5% of the grocery business in this country is SNAP business. FMI's own website has come up with a number that is 10%, but it's 5 or 10%. Now that's 100% change, and that certainly would affect somebody's decision on how much reliance to put on those numbers. But it's still a huge number, $69 billion. But it's still roughly a minor percentage of the whole sales of the grocery industry. So the point I would get back to though, we're asking for the government's record. Now what if these retail stores, instead of going through the EBT, the card process, the credit card process. Let's say the eligible families could just come in and take a basket of food or whatever, a cart of food, and that the store would keep track of the items that they took. And then they would submit that list of products, three loaves of bread, two gallons of milk, submit that to the government, and then the government paid them. We wouldn't even be here, because we would be very clear that the record being requested is the government's record of tax dollar spending. The only reason we're here is because they don't do it that way. They actually, it's a financial, this is how much money was spent here. But it wouldn't have to be that way. And that's how, if we are going to back up the truck so far as to say in this case, that there are other aspects of exemption four beyond the likelihood of substantial competitive harm, which was the sole essential issue that was tried in this case. If we go back and start adding, well, program effectiveness, which by the way, USDA, I mean, they didn't appeal the case. They never brought up program effectiveness. Why are we now to assume that FMI knows more about what program effectiveness should be than USDA, which administers the program? It seems a little peculiar to me. But if we're to add new elements to this case on appeal for the first time, I would back the truck up so far as to say, let's find an even simpler way to deal with this case and to say, wait a minute, this is not even an exemption four case. This is not the typical FOIA exemption for case in which somebody is trying to get information that is outside the realm of government, that is submitted to government by the private sector for whatever reason, because the government demands it for something, because they want to do business with the government. This is a record of having done business with the government. It's a completely different kettle of fish. I was telling my Argus leader people on the way up here, I said this isn't just the difference between apples and oranges, this is the difference between apples and elephants, we're that far removed from what the typical FOIA case was intended to do. FOIA was intended to protect the public's right to see government records, to get rid of the secrecy, to remove the veil of secrecy. And to that extent, they created, for the protection of the other side, these exemptions, nine of them. They are to be narrowly construed because FOIA is intended and is a fundamental transparency action, and it's been interpreted that way forever. What about the testimony, without getting into anything that's under seal, that the disclosure of this information is a windfall in looking at the models for how to run a grocery, what the profit margins are, total income. I think the district court found that was speculation, but was there something in the record that would show that? Well, that's a good question because it relates to one that was asked of Gavin. And that is, how do you use the information if you have it? If you know that grocery store A had $100,000 worth of SNAP business, you don't know. What can you extrapolate from that? Can you- Yeah, exactly, what do you extrapolate from that? What was the evidence of? You don't know if that's 95% of their business, you don't know if that's 42% of their business. And when we talked about this, well, how much of the store's business is SNAP business, that's not known. So you don't have that piece of information to help you connect the dots. That's exactly the reason why that model, while it may tend to enhance some projection, it's still such a conjectural projection that, quite honestly, if you're dealing with the infrastructure of the grocery business, or even a Walmart, which is considered the big bad bear here, the infrastructure that they would be required to invest in, based on that kind of information, they're not that stupid, these are not stupid business people, and they're not going to be making those judgments on the speculative, well, we don't know if that $100,000 for grocery store A is 5% of their business or 50% of their business. It'd make a big difference, but they won't know that. We're only looking for the gross annual amounts that stores are getting. Council? Yes, go ahead. You said the gross annual sales of a SNAP retailer. What you really meant was the gross annual sales of SNAP business. Yes. That the SNAP retailer did, isn't that right? Yes, I'm sorry, yeah, we're not looking for their actual sales. We just want their SNAP business. I thought that- Yeah, I'm sorry, I'm sorry. Okay, so essentially, I think that yes, the court had the benefit of this rebuttal expert who was brought in three days before trial. And yeah, he uses a model because he does market research. The question is, as you are suggesting, how do you connect the information? And having more information isn't unhelpful, but it certainly doesn't carry the day. And in this case, I think the question is, is it clearly erroneous for the court to have found it doesn't carry the day? And I would suggest that there are other things in the record. I mean, my clients had expert testimony too. Now, most people aren't in a position to afford to even undertake a FOIA case as a person requesting a record. I mean, in this case, 99.9% of the people who wanted to see this information would have quit in August of 2011. My client should win this case just for its perseverance. Because essentially, the government failed to respond in a timely way. There was no answer to the request for administrative appeal. It would have died on the vine. My client, of course, took this more seriously, and we proceeded. But at every stage, we have been met with really speculative, contradictory evidence. You were talking about the stigma. You were talking about, Judge Beam, you asked a question about why would somebody move in where the business is good. We had testimony, both at the summary judgment level and by form of declarations, which are in the record. And we also had testimony at trial that suggested, if the reason you don't want, this is from the retailers, the reason we don't want to have people know the SNAP information is, if it's better or worse than expected, things are going to happen. Better or worse? Well, first of all, I don't know what normal is, and I don't think the retailers know what normal is either. Because we don't know if Cumberland's store on the corner in Boston is 5%, 15%, 35%, 3%. We don't know what the profit margins are. Are we going to make decisions based on that? I mean, we don't know. And- I'm curious, is there anything in the record as to what makes this seemingly mundane information newsworthy? No, there isn't. And with all due respect, it's not incumbent upon us. In fact, there's cases that say- I prefaced it with, I was curious. No, I wish I could bring my reporter, Jonathan Ellis, up here to tell you exactly why he wants it. He was telling me last night, but I think I was distracted by the foot, the basketball game. It's not in the record, don't tell me. Yeah, no, it's not an exposure of anything in particular, but it's information that they believe they're entitled to to find out where the money is going. So, I mean, I guess, follow the money, so to speak. It's encompassed in some words in the Constitution that talks about freedom of the press, right? That would be part of it, yeah. But I guess I don't want to get off on the First Amendment since we're, you know, to complicate things. But I think there is other stuff. You know, we did get an expert. We got two experts. It's not something that most people could do. And it wasn't, you know, I didn't go out and buy somebody. I actually ended up with a guy, Dr. Volpe, who at the time I was connected to him through, you know, the economic grapevine. I later find out that he actually had started his career as a USDA economist and still did work for USDA. So, it's not like I was going outside the box to find somebody who hated the government or whatever. I actually went within and found, you know, and ended up with somebody who had a very valid opinion that the other testimony was not going to be, as a package, going to create the likelihood of substantial competitive harm. And that's what we were dealing with, and that's what the court went with. I would also say that, to me, one of the most remarkable aspects of this case is this. At the pre-summary judgment stage, to determine whether they wanted to proceed on summary judgment, on motion, the USDA undertook an RFI, a request for information, an official, you know, federal register type of thing. And they contacted every single one of the 321,000 plus, 321,000 plus SNAP retailers to tell them that there was going to be an RFI, that it was going to affect them, and that they should take a look at it. And I would like to read, and it's not a lengthy thing, but I want to read what that RFI said, just to tell you, or remind you, I'm not telling you anything, you probably know more about this than I do. This RFI was pointed out to every one of the 321,000 retailers. And I'm not finding it here, I'm not going to waste the time looking for it, but what it basically said was, and it was the most leading question ever, and said, if you think that the release of your SNAP annual data is going to be a problem, tell us why it's going to be harmful competitively, essentially. It led these people right to telling the government, so they could use it in support of their summary judgment motion, why this was going to be a danger. How many responses did they get? They got 235 people responded. 80 of them used, in the testimony of the person from the USDA who did the correlation, 80 of them used a word, competition, that would have allowed USDA to even consider that to have been an exemption for complaint. And then when it came time to do the summary judgment declarations, what did they do? The government used a copycat affidavit. Ten of the 15 affidavits that were submitted in support of this exemption four were identical. It probably didn't leave the greatest probative taste in anybody's mouth, and it certainly told me that there were 320,000 people out there. And I really do, I've got a minute 30, I really do want to find this. Were the responses from smaller grocers? Were they from some of the bigger retailers? Was that in the record? Yeah, every single one of the, well, there were 541 people who responded to the RFI. 235 were opposed to release, and 80 of them mentioned the word competition. So there were actually 540 plus responses, every one of which I have read. There were three of us in the world who have done that, opposing counsel for the USDA and their office. And so everybody is identified. Some of them were actual trade, like FMI was one of the people who responded. But it varied. But for the most part, there was no reference or evidence for finding competitive harm. And the reason is, I'm not criticizing any of these people. I'm not criticizing the retailers. I'm not criticizing FMI. But some things just cannot be proven because they're not. And this is not a failure on their part to prove substantial competitive harm or the likelihood of it. I'm telling you, or submitting to you, that it can't be established. It's just one of those things. It's just too amorphous. It's just not substantial enough. It's a piece of material evidence that's going to create the likelihood of substantial competitive harm. And when 320,000 of 320,200 and whatever don't bother to respond, that tells you something. They're the ones that would know. Are you saying that we've been presented evidence that's based strictly on whim and caprice? Am I getting that? That's a pejorative way of putting speculation and hope. People don't want to tell other people about certain things, and businessmen don't like to share money information. That doesn't mean it's going to cause great harm. Thank you very much. Thank you, Mr. Arneson. Rebuttal? I'd like to make a couple quick points. First, regarding the harm that's going to be caused. Judge Kelly, you cited to Mr. Kondracky's testimony, and I just want the court to hear the question and answer that was asked. Mr. Kondracky was the USDA's expert who testified regarding how he could use this information. He said, the question was, and do you have an opinion about how the release of individual store SNAP data will impact the modeling process and the forecast? And he says, yes, it will create a windfall for us and for our competitors to be able to target and to benchmark these store sales. We believe we can easily accomplish that with this information. That was the testimony of a person who has spent his career modeling stores, that he could take this information and figure out a store's total sales just based on the SNAP sales that were produced. Did he take the next step in saying, and here's how that will occur? He did not walk through the steps of how he was going to actually walk. This is my opinion, don't ask me the reasons. Well, no, Your Honor, I mean, he went through and he described, this is the end result. This is what I could do with it. He didn't break down the individual steps. He did talk about the steps that he uses in his current model, which the court misunderstood, frankly. I don't think there's any dispute about that. He said, I build a model for current stores, for my current clients, that I can use to predict 90 to 99% accurately what my current clients are going to do. And the district court misunderstood that information to mean, that this SNAP data release then won't cause any harm. Because we've already got models out there that are modeling stores at 90 to 99% accuracy. Well, in fact, what he was saying was, when I start out with my client's own sales data, I can match up my model to their sales data. He wasn't saying that I've already created a model that can predict 90 to 99% of other stores. That was just an error that the court made in its interpretation, which I think is fundamental to its conclusions regarding competitive harm. Quickly on the person issue, I do want to get back to Judge Grinder's question. The US Supreme Court has held that obtained from a person is information obtained outside the government. That's the Federal Open Market Commission case. And then this is the DC Circuit case that I mentioned to you before, the Board of Trade of the City of Chicago. The DC Circuit has held that the scope of Exemption 4 is sufficiently broad enough to encompass financial and commercial information concerning a third party. And that Exemption 4 is applicable whether the commercial interest belongs to the party that provided the information or a third party. With that, I would ask that the court consider this case in reverse and remand to the district court for further proceedings. Thank you, counsel. Court appreciates the arguments today. We'll take the matter under submission and issue an opinion in due course. Thank you for your arguments.